UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARSHA EAGLE,

             Plaintiff,

vs.                                              Case No. 12-13704
                                                 HON. GERSHWIN A. DRAIN


HURLEY MEDICAL CENTER,

             Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#16] AND DEFENDANT'S MOTION FOR PROTECTIVE ORDER [#15]

### I.      INTRODUCTION

Plaintiff, Marsha Eagle, filed the instant action against her former employer, Hurley Medical Center ("HMC"), claiming that HMC violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*., and Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"), MICH. COMP. LAWS § 37.1101 *et seq*. by terminating her for allegedly walking off the job and "fraudulent use of FMLA." Plaintiff, who has lupus, claims that she left without permission during her shift because she was assigned to a more physically demanding assignment.

Presently before the Court is Defendant's Motion for Summary Judgment and Defendant's Motion for Protective Order, filed on April 19, 2013. Defendant argues that it did not violate the FMLA when it terminated Plaintiff's employment, as the job she refused to do is not more physically demanding than the one she requested, and Plaintiff did not properly notify Defendant of her disability. Defendant also argues that the affidavits of Lavonda Rimmer and

1

Patricia Ramirez should be stricken, as they were taken in violation of Michigan Rule of Professional Conduct 4.2 and after discovery had closed. For the reasons that follow, the Court denies Defendant's Motions for Summary Judgment and Protective Order.

## II.    FACTUAL BACKGROUND

### A.  Plaintiff's Employment With Defendant

Plaintiff became employed by HMC on February 27, 1989. She worked as a pharmacy technician for the entirety of her employment with Defendant. Plaintiff worked on the second shift, which ran from 2:30 p.m. until 11:00 p.m. At the end of Plaintiff's employment, Defendant's Director of Pharmacy was Amy Benko. Marsha Strozier-Wesley worked as Pharmacy Supervisor and reported to Benko. Strozier-Wesley was responsible for disciplining, scheduling, and evaluating the pharmacy technicians and was Plaintiff's supervisor.

Plaintiff received performance evaluations every year. In the last three years before Plaintiff's termination, Plaintiff's performance evaluations were conducted by Strozier-Wesley. Plaintiff received an overall grade of 4.12 on her 2010/2011 performance evaluation, which Strozier-Wesley testified was considered a very good grade.

### B.  Plaintiff's Medical Condition

Plaintiff was diagnosed with systemic lupus erythematosus (lupus) in 2008/2009. Lupus is an autoimmune disease that affects a person's connective tissue and causes fatigue and joint pain. In early 2009, Plaintiff sought a medical leave due to her lupus, as she was suffering from fatigue, joint stiffness and paresthesia (numbness and tingling). Plaintiff's disability claim form was brought to the attention of Veronica Robinson, Defendant's Assistant Director of Employee Health Services. On September 15, 2010, Plaintiff requested from the Employee Health Office

(EHO) that she not be required to work more than eight hours in a shift. In her request for reasonable accommodation, Plaintiff states:

> Not able to work during periods of cellulitis episodes. Because of lupus the level of exhaustion interferes with normal functioning. Tiredness exists during periods when the disease is under control.

A cellulitis episode is a flare up of lupus. Plaintiff's request was also supported by medical documentation from her physician that was given to Jennifer Carvounis, the Defendant's EHO nurse. The EHO gave Plaintiff ADA paperwork, which she completed on October 20, 2010. EHO then notified the pharmacy department of Plaintiff's work restrictions, without providing a diagnosis due to Plaintiff's request that her exact condition not be revealed to her department. Robinson testified that Plaintiff's request for accommodation and restrictions would have been discussed with Amy Benko, although she would not have shared Plaintiff's diagnosis of lupus. She would have told Benko that Plaintiff suffered from fatigue at that time.

Plaintiff requested intermittent FMLA leave in 2011 due to lupus flare-ups. In May 2011, Plaintiff was granted the leave for the period of April 29, 2011 to October 28, 2011. Defendant's EHO was aware that Plaintiff had approved FMLA for her condition. Plaintiff's supervisor, Strozier-Wesley, was also aware that Plaintiff was granted FMLA. David Szczepanski, Defendant's Administrator of Labor Relations and the ultimate decision maker in this case, testified that he assumed Plaintiff suffered from lupus because she was granted FMLA.

### C.  Plaintiff's Dispensing Job Versus IV Admixture Job Duties

Plaintiff had two primary assignments as a second shift pharmacy technician, unit dose dispensing (dispensing) and intravenous admixture (IVAD). The dispensing job duties primarily consisted of distributing medications to patients under the supervision of a pharmacist. The IVAD job required the pharmacy tech to create injectable mixtures that would be delivered to

patients. There is a dispute about how physically demanding the dispensing job versus the IVAD job is.

Plaintiff testified that the dispensing job required her to be on her feet more than the IVAD job as she could not sit down while dispensing. She also needed a step stool to do the dispensing job because there were medications that were out of her reach. Strozier-Wesley disputes this assessment. She claims that both assignments require the same amount of physical exertion, so inability to perform one means Plaintiff could not perform the other. Benko agrees, noting that IVAD could involve more sitting time, whereas there is more reaching involved in dispensing as well as counter space to cover requiring more walking.

One of the Defendant's pharmacists, Lavonda Rimmer, testified that she was able to observe pharmacy techs do both the dispensing job and the IVAD job. Based on her observations, she stated that it was clear to her that the dispensing job was more physically demanding than the IVAD job. According to Rimmer, the dispensing job was more physically demanding during the course of an 8-hour shift, because it requires pharmacy technicians to be on their feet for approximately 6½ hours, or approximately 81% of the shift as opposed to four hours for the IVAD job.

**D. July 14, 2011**

Prior to July 14, 2011, Plaintiff's employment with Defendant was not in jeopardy. She also had never requested a change in her assignment as an accommodation of her Lupus. Three days prior to July 14, Plaintiff had been working the dispensing job with no lunch coverage. She testified that she was not able to sit down. She further stated:

> I had been working basically 24 hours in that particular assignment where I was doing what I had explained in the packaging room, and those assignments were building up to a crescendo with my legs.

> And so when I came to work on the 14th I knew I would be – I thought I would be assigned in the IV room because I knew that by what the schedule said. I said, 'I think I can handle this cause I'll be sitting down.'
>
> So when I got there and I saw that my assignment had been changed I'm like 'Oh, my God', you know, because I knew I was going to have to be on my feet another eight hours. I couldn't handle it.

She became, according to Defendant, angry and hostile, and went into Amy Benko's office and threatened to leave if her schedule was not changed. What Plaintiff and Benko then discussed is disputed.

Three pharmacy employees who were in the area of the office provided statements as follows:

> Denise Brilinski – Remembered M. Eagle stating on July 14, 2011, if she couldn't get her assignment in IVAD she was "calling the union and going home."
>
> Elvira Madarang – M. Eagle came into the department office looking for A. Benko. She complained about her assignment for the evening "If my assignment is not changed I will leave."
>
> Susan Miller – M. Eagle came into the department office looking for A. Benko. A. Benko was in a meeting at that time, approximately 2:25 pm. M. Eagle stated "I need to see her because if I can't get my work area assignment changed I am leaving."

Benko sat down with Plaintiff at 2:45 p.m. Plaintiff told Benko that she wanted the IVAD job because she had been in the dispensing job for several days straight and that the only reason she came to work that day was because she knew she was assigned to the IVAD job. According to Benko, Plaintiff told her that she could not do the dispensing job assignment because she never gets lunch coverage. Benko immediately went out into the pharmacy and made arrangements for Plaintiff to be covered for her lunch break. She came back into the office and informed Plaintiff that her co-workers would cover Plaintiff's lunch break. Plaintiff took a call from her union president, and then came back into Benko's office and simply said, "I cannot do this." Benko stated that she told Plaintiff that her disability restriction does not prevent her from

moving Plaintiff to a different assignment. Benko then asked the Plaintiff if she was going home. Plaintiff responded "yes," and left the department.

According to Plaintiff, she told Benko that due to her lupus, her legs could not withstand the constant standing in the dispensing job for a fourth day in a row. Plaintiff stated that she clearly told Benko that she was suffering from fatigue. Plaintiff also told Benko that she could not handle the dispensing job another day in a row and that she would take FMLA leave in order to come to work on July 15. According to Plaintiff, Benko stated there was nothing she could do.

Plaintiff's union president instructed her to go to the Employee Health Office and speak to the nurse about her situation. Plaintiff went at 3:00 p.m. and met with Jennifer Carvounis. Carvounis charted the following:

> Into EHO states wants to go home FMLA, was sent here by Delores Lotts. Marsha upset, teary states her assignment for today of 'working up front' is something she can't do d/t (due to) her lupus. When I asked her if she was not feeling well today, she indicated 'no'. Also c/o (complained of) 'weird feeling in her head' …. Advised if she is not feeling well she can call off FMLA as she planned. (Null set symbol) covered by EHO.

Carvounis testified that Plaintiff indicated that she was feeling well, which is why she did not chart any symptoms. She did not discuss job duties that created problems with her. Plaintiff testified that she did tell Carvounis she was not feeling well. Carvounis testified that while she took Plaintiff's blood pressure and pulse, there was no medical examination that she could conduct to determine whether Plaintiff was suffering a lupus flare-up. Robinson also testified that Defendant's EHO could not have given Plaintiff permission to go home anyway, as the only reasons they could send an employee home is if the employee suffered a work related injury or had contracted a communicable disease. According to Robinson, Plaintiff's option under these circumstances was to go home under her FMLA.

In Plaintiff's call-off report for July 14, 2011, she indicated that she was using FMLA for this absence. On her leave form, however, she documented that she "went home ill through employee health office" and did not mark the "yes" box next to the question "Requesting Family and Medical Leave (FMLA)?"

Defendant maintains that at no time between July 14, 2011 and August 8, 2011, did Plaintiff provide any information to the pharmacy department, or the EHO, to support that she was physically unable to perform the dispensing job duties on July 14. Strozier-Wesley testified, "There was nothing there [in the information provided to her by the EHO] to indicate that Marsha could not do her assignment. No restrictions, nothing that I could see or anybody that reviewed my summary could see."

### E.  Termination

Benko was sent a memorandum on July 15, 2011, that Plaintiff experienced fatigue and exhaustion during times her medical condition flared up. Benko testified that as of July 18, she was aware that Plaintiff went to EHO because of her medical condition and that she was planning on using FMLA.

Strozier-Wesley was asked to investigate what had happened on July 14, 2011, as she was Plaintiff's supervisor. On July 29, Strozier-Wesley completed her investigation. After interviewing pharmacy employees who were present during the incident, Wesley concluded:

> Based on the above statements it is management's conclusion that M. Eagle's decision to leave was in direct protest to her assignment in dispensing. Marsha's need to maintain the IVAD assignment was not validated through the EHO and she left on her own accord.

Strozier-Wesley admits that she did not speak to Plaintiff about the incident until she issued her the suspension pending termination on August 9, 2011.

On August 9, 2011, Plaintiff was issued a notice of suspension pending termination. A work 32 violation was added to accuse Plaintiff of fraudulent use of FMLA. Strozier-Wesley met with Plaintiff and her union representative, Patricia Ramirez, who spoke on her behalf, to discuss the discipline. Ramirez testified that on August 9, she told Strozier-Wesley that Plaintiff did not refuse to do her job on July 14 and that Plaintiff was unable to do the job because of her leg pain and fatigue caused by her lupus. Ramirez further told Strozier-Wesley that if Benko had allowed Plaintiff to stay in her assigned IVAD job that day, Plaintiff would have had no need to call off. In response, Strozier-Wesley stated that she did not care if Plaintiff could not physically do her job on July 14 and that Defendant did not feel as though it needed to accommodate her.

On August 19, 2011, Plaintiff told Robinson that she was unable to do her assignment on July 14 because of her medical condition. Robinson understood this to be a possible request for an accommodation, but did not share this information with anyone.

Plaintiff was terminated on September 1, 2011 for "gross misconduct related to fraudulently using Family Medical Leave. FML does not entitle you to leave when you are upset about your assignment." Ramirez testified the following:

> [B]etween August 9, 2011 and September 1, 2011, I told Mr. Sczcepanski that the reason why Ms. Eagle could not do her work assignment on July 14, 2011 was because she was suffering a flare-up of her Lupus, that her legs were hurting her, and the leg pain was causing her fatigue. Furthermore, I told Mr. Sczcepanski that all Ms. Eagle was looking for was a simple accommodation on July 14, 2011 to remain in the intravenous admixture job as opposed to the unit dose dispensing job so that she did not have to call off and use FMLA leave. I told Mr. Sczcepanski during this time period between August 9, 2011 and September 1, 2011 that Ms. Eagle was not falsifying her reason for FMLA leave, that she did suffer a flare-up of her Lupus, and that the only avenue that she had was to call off on that particular day.

On September 28, 2011, Ramirez approached Szczepanski and requested a Last Chance Agreement for the Plaintiff. Szczepanski testified that he only receives this kind of request when the union does not dispute the allegation of rules violation, but makes a plea for "one last

chance" for a long-term employee. He states that this request is always presented in a way that suggests, "I know my union member screwed up, but please give her a last chance in lieu of discharge." This request was denied and Plaintiff was terminated on September 1, 2011.

As a result of her termination, Plaintiff filed a claim with the Equal Employment Opportunity Commission (EEOC). The EEOC determined that Defendant had violated Plaintiff's rights under the ADA because it did not accommodate her and discharged her because of her disability.

### F. Lavonda Rimmer and Patricia Ramirez

Plaintiff filed a Witness List on February 11, 2013 that included both Lavonda Rimmer and Patricia Ramirez. On February 20, Plaintiff testified during her deposition that Ramirez was a material witness. Defendant's First Interrogatories asked Plaintiff to identify witnesses in this case and to provide their anticipated testimonies. Plaintiff's listed Lavonda Rimmer, saying "Ms. Rimmer can testify that Plaintiff was a good employee."

The discovery cutoff was set for March 29, 2013. During discovery, Defendant allowed the depositions of any employees requested by Plaintiff's counsel. Plaintiff's counsel deposed six of Defendant's employees. Plaintiff's counsel had also requested two more depositions of Defendant's employees, but following the other six, determined that the additional two were unnecessary.

On April 1, 2013, Plaintiff's counsel served Defendant with disclosures pursuant to Federal Rule of Civil Procedure 26(a), which contained an affidavit from pharmacist Lavonda Rimmer. In this affidavit, Rimmer testified that the dispensing job is more physically demanding than the IVAD job. On April 3, 2013, Plaintiff's counsel served Defendant with disclosures

9

including an affidavit of Patricia Ramirez. This affidavit contains information regarding Plaintiff's termination.

There is a dispute as to whether Rimmer was a managerial employee at Defendant HMC. According to Defendant, Rimmer is a direct supervisor of the Plaintiff and a managerial employee. In contrast, according to Plaintiff, Rimmer was a rank-and-file employee. To support this position, Plaintiff looks to the affidavit of Rebecca Jackson, Defendant's former Assistant Director of Human Resources, who was responsible for generating job descriptions and job classifications for employees. Jackson testified that Rimmer was not a managerial employee at HMC. First, Rimmer was, and still is, a member of the nurses' union that represents pharmacists at HMC. She was not part of the bargaining unit for supervisors and managers, which included people such as Strozier-Wesley, the supervisor in the pharmacy department.

Furthermore, the job description for pharmacists at HMC does not include managerial duties and responsibilities. Rimmer does not have typical managerial duties such as issuing work schedules, disciplining employees, or conducting performance evaluations. According to Plaintiff, while Rimmer supervised pharmacy technicians that worked under her, her supervision was limited to her professional capacity as a pharmacist – she would simply oversee them when they dispensed or created medication.

There is also a dispute as to Ramirez's position within Defendant HMC. Ramirez has been an employee of Defendant for over thirty years, and is currently employed as a Senior Biller. She served as bargaining chair for AFSCME Local 1603, the union that represents the bulk of the workforce at HMC, from 2006 to 2012. According to Defendant, Ramirez was involved in Plaintiff's termination process because of her role as bargaining chair. Plaintiff

10

argues that Ramirez is another example of a "rank and file" employee, and that she is simply a fact witness to the events leading to Plaintiff's termination.

### III.   ANALYSIS

#### A. Motion for Summary Judgment

##### 1. Standard of Review

Federal Rule of Civil Procedure 56(a) states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A court's use of summary judgment is an integral part of the fair and efficient administration of justice; it is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The substantive law determines which facts are material. Only disputes over facts that might affect the outcome of the suit are considered material. A dispute is only "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden in summary judgment and must demonstrate through portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits that no genuine issue of material fact exists. *Celotex Corp.*, 477 U.S. at 323. If the moving party successfully demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific

facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 270 (1968).

### 2.   Family and Medical Leave Act (FMLA)

The FMLA entitles an employee to twelve weeks of unpaid leave each year if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." U.S.C. § 2612(a)(1)(D). A "serious health condition" includes "an illness, injury, impairment, or physical or mental condition that involves … continuing treatment by a health care provider." 29 U.S.C. § 2611(11). There are two theories of recovery available to employees under the FMLA: 1) interference with FMLA right; and 2) retaliation. *Wysong v. Dow Chemical*, 503 F.3d 441, 446 (6th Cir. 2007).

Interference claims under the FMLA are governed by 29 U.S.C. § 2615(a)(1). To establish a claim for FMLA interference, a plaintiff must demonstrate that (1) she was an eligible employee under the FMLA; (2) the defendant was an employer under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave notice to the defendant of her intention to take leave; and (5) the defendant denied her rights to which she was entitled by the FMLA. *Walton v. Ford Motor Co*., 424 F.3d 481, 485 (6th Cir. 2005).

There is no dispute that the first three requirements are satisfied. Rather, Defendant contends that the Plaintiff's Complaint fails as a matter of law because she has not introduced evidence that she gave notice of her intention to take leave or that the employer denied her rights under the FMLA. Contrary to Defendant's argument, there is a genuine issue of material fact whether Plaintiff provided sufficient notice and whether Defendant's decision to discharge her was because of her disability. Thus, Defendant's Motion for Summary Judgment must be denied.

An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA–qualifying leave. 29 C.F.R. § 825.302(c). FMLA claims are dismissed when the employee has failed to provide complete information about the need for leave. *Wilson v. Noble Drilling Services, Inc*., No 10-20129, 2010 WL 5298018 (5th Cir. Dec. 23, 2010). Courts have held that a failure to provide the employer with sufficient information about a medical condition will prevent an employee from asserting rights under the FMLA. In *Johnson v. Primerica*, No. 94-4869, 1996 WL 34148, at *1 (S.D. N.Y. Jan. 30, 1996), the plaintiff requested leave to attend to "a matter … of significant financial importance to [his]…family." When the leave was denied, he took the time off anyway. *Id*. at *2. The real reason for the absence was to stay home and care for an asthmatic child. *Id.* The court rejected the plaintiff's FMLA claim stating that the FMLA does not require the employer to be "clairvoyant." *Id*. at *5.

However, if an employee does not provide enough information, an employer should inquire further to obtain additional information about the purpose of the leave. 29 C.F.R. § 825.301(a). While the employee must include sufficient information, "the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 302(c). In *Cavin v. Honda of America*, 346 F.3d 713, 723 (6th Cir. 2003), the Sixth Circuit held that it is "inappropriate to articulate categorical rules governing the content of notices." Whether the notice is sufficient depends on the facts and circumstances of each individual case. The Sixth Circuit further stated:

> An employee can provide sufficient notice to his employer that he needs FMLA-qualifying leave without invoking the FMLA and without using the words 'leave' or 'leave of absence.' The notice is sufficient if the employee provides enough information for the employer to reasonably conclude that a leave is needed for a serious health condition.

13

*Id.* at 725.

Whether sufficient notice has been given is often a question of fact precluding summary judgment for the employer. *See Mauricio v. Texstar Enterprises, Inc*., No. 06-0487, 2008 WL 558211, at *4 (W.D. Tex. 2008); *Lind v. Illinois Dept of Corrections*, No. 05-4059, 2007 WL 2684165, at *2-3 (C.D. Ill. Sept. 6, 2007); *Jedlowski v. Charter Township of Genesee*, No. 06-15695 2007 WL 3408544, at *6 (E.D. Mich. Nov. 14, 2007); *Washington v. Cooper Hospital/University Medical Center*, No. 03-5791, 2005 WL 3299006, at *7 (D. N.J. Dec. 2, 2005); *Dinkins v. Varsity Contractors, Inc*., No. 04-C-1438, 2005 WL 599979, at *9 (N.D. Ill.)

Defendant asserts that it never received proper notice from Plaintiff. Defendant claims that it only knew of one work restriction, that Plaintiff could not work in excess of eight hours in a day or forty hours in a week, which was accommodated by the Defendant. Prior to July 14, 2011, Plaintiff had never requested a change in her assignment as an accommodation of her Lupus. According to Defendant, the physical exertion required for the two work assignments was essentially the same, so there would be no reason for the supervisor to think that Plaintiff's request for an assignment change was actually a request for FMLA leave.

Defendant maintains that Benko spoke with Plaintiff when she became agitated upon arrival at work on July 14, 2011. Plaintiff said she could not do her assignment, but did not ask for leave under the FMLA. Benko, as required, inquired further as to why Plaintiff claimed she could not do her assignment. Plaintiff told Benko that she could not do the dispensing job assignment because she never gets lunch coverage, and Benko immediately went out into the pharmacy and made arrangements for Plaintiff to be covered for her lunch break. After that, Plaintiff simply said, "I cannot do this." Plaintiff then went to the Employee Health Office. Plaintiff, according to Defendant, did not provide her physical symptoms, but rather complained

14

about her assignment. When she was asked if she was not feeling well, she answered in the negative. The only complaint she made related to a failure to wean herself off a medication before stopping, nothing related to lupus. Plaintiff did not talk about any job activities with the nurse, Carvounis, that would prevent her from doing her assignment. She also did not properly complete her leave form, as she did not indicate that her leave was due to any FMLA related reason. However, Defendant admits that Plaintiff told Benko that she would go home and "call off FMLA" if her assignment was not changed.

According to Plaintiff, she told Benko that she wanted the IVAD job because she had been in the dispensing job for several days straight and that the only reason she came to work that day was because she knew she was assigned to the IVAD job. She further told Benko that due to her lupus, her legs could not withstand the constant standing in the dispensing job for a fourth day in a row. Plaintiff told Benko that she would take FMLA leave in order to come to work on July 15. Plaintiff contends that while Benko testified that Plaintiff did not inform her of her lupus symptoms on July 14, her deposition statements indicate otherwise. Benko stated that Plaintiff could not (not that she was unwilling) to do the dispensing job on July 14. Furthermore, Benko testified that she told Plaintiff that her disability restriction does not prevent her from transferring Plaintiff to a different assignment, indicating that Plaintiff did raise her medical condition with Benko during their conversation.

While Carvounis stated that Plaintiff indicated "no" when asked if she was not feeling well, she also recorded "Marsha upset, teary states her assignment for today of 'working up front' is something she can't do d/t (due to) her lupus." On Plaintiff's July 14, 2011 call off sheet, she indicated that she was taking leave pursuant to her approved intermittent FMLA leave.

On July 15, Benko was again informed that Plaintiff suffers from fatigue associated with her medical condition.

According to Defendant, Plaintiff did not sufficiently inform her employer of her intent to take FMLA leave. She simply did not want to do the dispensing job assignment and walked out without informing her supervisor of her lupus flare-up. However, according to Plaintiff's testimony, she did inform her supervisor during their conversation about her disability symptoms. This is supported by her deposition, by certain statements made by Carvounis, and by the call-off sheet in which she listed FMLA. She at least informed Defendant of her intention to use FMLA. If Defendant did not believe that Plaintiff was taking July 14, 2011 off for the reasons stated as her lupus flare-up, it had the right to ask for her to re-certify for that particular day. 29 C.F.R. § 825.308(c)(3). However, Plaintiff has demonstrated a genuine issue of material fact as to whether she provided sufficient notice to Defendant that she was taking leave because of her disability. In a motion for summary judgment, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 587. Therefore Plaintiff's statement of facts should be taken as true in determining whether she provided notice. The evidence is not so one-sided that Defendant must prevail as a matter of law.

Furthermore, if an employer takes an employment action in whole or in part on the fact that the employee took FMLA protected leave, the employer has denied the employee a benefit to which she is entitled. *Donald v. Sybra, Inc*., 667 F.3d 757, 761 (6th Cir. 2012). Employers cannot use the taking of FMLA leave as a negative factor in employment actions. 29 C.F.R. § 825.220(c). It is undisputed Plaintiff was terminated for taking leave on July 14, 2011. Defendant

claims that Plaintiff was terminated for taking leave that was not protected by the FMLA. If Plaintiff's statements are taken as true, however, her leave is protected by the FMLA.

Therefore, there is a genuine issue of fact as to whether Plaintiff made a request for leave under the FMLA on July 14 and whether her FMLA leave was a factor in the decision to terminate Plaintiff. Defendant is not entitled to judgment in its favor on Plaintiff's FMLA claim.

### 3.   Americans With Disabilities Act (ADA)

A failure to accommodate disability discrimination claim under the ADA requires the plaintiff to show that: 1) she is disabled within the meaning of the Act; 2) she is otherwise qualified for the position, with or without reasonable accommodation; 3) her employer knew or had reason to know about her disability; 4) she requested an accommodation; and 5) the employer failed to provide the necessary accommodation. *Macy v. Hopkins County School Board of Education*, 484 F.3d 357, 365 (6th Cir. 2007).

The employee has the burden of proposing an initial reasonable accommodation. *Regan v. Faurecea Auto Seating, Inc*., 679 F.3d 475, 480 (6th Cir. 2012). The formalisms about the manner of the request do not matter under the ADA – what is important is whether the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation. *Taylor v. Phoenixville School Dist*., 184 F.3d 296, 313 (3d Cir. 1999). The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). This process requires good faith communication between the parties to explore possible accommodations. *Kleiber v. Honda of America*, 485 F.3d 862, 871 (6th Cir. 2007).

Plaintiff's Complaint alleges that on July 14, 2011, she asked Defendant to accommodate her by placing her in a job that did not require her to walk throughout the Medical Center, and that her accommodation was denied.

Defendant contends that Plaintiff did not make a request that would have been understood by her supervisor as a request for reasonable accommodation. According to Defendant, both assignments required her to walk through the Medical Center doing rounds/deliveries on the nursing units. Therefore, changing her assignment from the IVAD job to the dispensing job would not be a reasonable accommodation because she would still have to make rounds. According to Defendant, if Plaintiff was actually suffering from fatigue, a reasonable accommodation would have been to ask if another pharmacy tech could do all the rounds. Defendant contends that both jobs required the same amount of sitting and standing, so asking not to be assigned to one job was not a request for reasonable accommodation. Plaintiff also admits that she did not request to sit down in the dispensing assignment, and Strozier-Wesley testified that it was not mandatory to stand up while doing certain dispensing tasks.

Defendant further contends that even if Plaintiff had told Benko that she was fatigued, that would have still been insufficient to place Benko on notice that Plaintiff needed an accommodation due to her lupus because her work restrictions stated that she could not work more than eight hours in a day. Since Plaintiff's request was made within fifteen minutes of arriving at work, Benko, the Defendant states, could not connect the word "fatigue" with Plaintiff's lupus condition.

Plaintiff contends that there is a genuine issue of material fact whether or not Plaintiff requested an accommodation. On July 14, 2011, Benko brought up Plaintiff's disability restrictions during their conversation and told Plaintiff that her disability restriction did not

require her to be moved to another assignment; this indicates that Benko thought Plaintiff was asking for an accommodation for her disability at that time. Ramirez also testified that she told both Strozier-Wesley and Szczepanski that Plaintiff was seeking an accommodation on July 14, 2011. Therefore, Plaintiff contends, Defendant refused to engage in good faith communications regarding Plaintiff's need for an accommodation.

While Defendant states that Plaintiff's request to be assigned to the IVAD job instead of the dispensing job was not a request for reasonable accommodation, as the jobs had equal physical demands, Plaintiff has introduced evidence that suggests otherwise. Plaintiff testified that the dispensing job required her to be on her feet more than the IVAD job. Benko also testified that on busy days a pharmacy technician doing the IVAD job could sit more in front of the ventilation hood, and that the dispensing job requires reaching. One of the Defendant's pharmacists, Lavonda Rimmer, testified that based on her observations, she believed that the dispensing job was more physically demanding than the IVAD job. According to her, the dispensing job required technicians to be on their feet for approximately 81% of the shift versus 50% for the IVAD job.  Therefore Plaintiff contends that the request for a change of job was a request for a reasonable accommodation, and should have been understood as such by Defendant.

Looking at the facts in the light most favorable to the nonmoving party, the Court concludes there is a genuine issue of fact regarding the issue of whether Plaintiff requested a reasonable accommodation and whether Defendant failed to engage in good faith communication regarding Plaintiff's request for an accommodation, which precludes summary judgment.

### 4.  Michigan's Persons With Disabilities Civil Rights Act (PDCRA)

To establish a prima facie case of discrimination under PDCRA, a plaintiff must demonstrate that 1) she has a disability, 2) that the disability is unrelated to her ability to perform

19

the duties of a particular job, and 3) that she was discriminated against in one of the ways described in the statute. *Rollert v. Department of Civil Service*, 228 Mich. App. 534, 538 (1998). Michigan courts view federal civil rights law as persuasive authority in interpreting Michigan civil rights law. *Harrison v. Olde Financial*, 225 Mich App 601, 606 (1997). The Michigan Court of Appeals and the Michigan Supreme Court have noted that the ADA and the PDCRA share the same purpose and use similar definitions and analyses, and both courts have relied on the ADA in interpreting the PDCRA. *Chiles v. Mach Shop, Inc.*, 238 Mich App 462, 472; 606 N.W.2d 398, 405 (Mich. Ct. App. 1999). Since the PDCRA substantially mirrors the ADA, the resolution of a plaintiff's ADA claim will generally (though not always) resolve the plaintiff's PDCRA claim. *Cotter v. Ajilon Serv., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002), *overruled on different grounds by Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 313 (6th Cir. 2012). The above ADA analysis is applicable to this issue as well, thus summary judgment is not appropriate for this claim either.

### B.  Motion for Protective Order

#### 1.  Standard of Review

Federal Rule of Civil Procedure 26(c) provides that the court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. FED. R. CIV. P. 26(c)(1). This Rule confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required. *Seattle Times Co v. Rhinehart*, 467 US 20, 36; 104 S Ct 2199, 2209; 81 L Ed 2d 17 (1984).

The party seeking protection bears the burden of demonstrating that there is good cause for restricting the disclosure of the information at issue. *In re Violation of Rule 28(D)*, 635 F.3d 1352, 1357 (Fed. Cir. 2011). For good cause to exist, the party seeking to limit the disclosure of

discovery materials must show that specific prejudice or harm will result if no protective order is granted. *Id.* at 1357-58 (citing *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002)).

### 2.   Michigan Rule of Professional Conduct 4.2

This court is generally guided by the Michigan Rules of Professional Responsibility (MRPC) in assessing whether ethical standards were violated. *City of Kalamazoo v. Michigan Disposal Serv. Corp.*, 125 F Supp 2d 219, 231 (W.D. Mich. 2000). Defendant maintains that Plaintiff's counsel violated the MRPC by contacting and obtaining affidavits from Rimmer and Ramirez. MRPC 4.2 (the "no-contact rule") states the following:

> In representing a client a lawyer shall not communicate about the subject of the representation with a party whom the lawyer knows to be represented in the matter by another lawyer, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

A comment to Rule 4.2 further addresses the application of the rule where the client is an organization:

> In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for the purpose of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

Rule 4.2 serves to: (1) prevent an attorney from circumventing opposing counsel in order to obtain statements from the adversary; (2) to preserve the integrity of the attorney-client relationship; (3) to prevent the inadvertent disclosure of privileged information; and (4) to facilitate settlement by involving lawyers in the negotiation process. *Smith v. Kalamazoo Ophthalmology*, 322 F. Supp. 2d 883, 888 (W.D. Mich. 2004).

The term "party" is limited to three specific types of agents: (1) managerial employees, (2) employees whose act in the matter can be imputed to the organization, and (3) employees whose admission at trial would be binding on the organization. *Valassis v. Samelson*, 143 F.R.D. 118, 123 (E.D. Mich. 1992). Even lower grade employees can bind the employer if the employee is used for a certain function and the employee admits to matters concerning that function. *Banner v. City of Flint*, 136 F. Supp. 2d 678, 687-88 (E.D. Mich. 2000), *aff'd in part*, 01-1118/01-1401/02-1297, 99 Fed. Appx. 29, 31 (6th Cir. 2004) (citing *McCallum v. CSX Transp. Inc.*, 149 F.R.D. 104, 111 (M.D.N.C.)).

This Court has granted a protective order where "there [was] evidence that someone purporting to act on behalf of Defendants [communicated] with an employee of Plaintiff about the case at bar." *Lorillard Tobacco Co. v. Kamposh, LLC*, No. 05-71324, 2006 WL 3497311, at *4 (E.D. Mich. Dec. 1, 2006). In *Lorillard*, the plaintiff requested the court enter a protective order to preclude any ex parte communications with its employees. *Id.* at *3. Plaintiff asserted that one of their sales representatives was asked questions related to the litigation by a man who identified himself as the defendants' attorney. *Id.* at *4. The court found that the sales representative was an individual who may fall within the definition of "a party whom the lawyer knows is represented" under Rule 4.2. *Id.* Although not convinced that there actually was an ex parte communication between the sales representative and defendants' counsel, the court granted the motion for protective order. *Id.* at *5.

However, in *Perry v. City of Pontiac*, 254 F.R.D. 309 (E.D. Mich. 2008), the Court held that interviews with certain employees, outside the presence of the employer's counsel, were permissible. In this case, the plaintiffs alleged that they were the victims of excessive force by certain Pontiac police officers. *Id.* at 311. The plaintiffs' counsel wanted to interview several

22

Pontiac police officers outside the presence of defense counsel. *Id.* The court opined that lower-level employees can make admissions that bind their employer, but only if their job function has something to do with the issue at hand. *Id.* at 315 (citing *McCallum*, 149 F.R.D. at 111). Employees who merely witness an event may be contacted by counsel as to those matters they observed without constituting employer admissions. *Id.* Employee witness statements would be important fact information, but would not be employer admissions. *Id.* The *Perry* court stated:

> [T]he determination of whether employees of a party may be contacted by opposing counsel turns on whether their statements or conduct can be attributed to the employer itself … A statement by an employee of an organization can bind the employer vicariously only if the opposite party can establish the necessary foundation. This foundation is created by: (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.

*Id.* at 316.

Furthermore, in *Hill v. Spiegel, Inc.*, 708 F.2d 233 (6th Cir. 1983), the plaintiff, who sued for age discrimination, sought to introduce the testimony of a subordinate that three other managers told him that the plaintiff was discharged because of his age. The court held that, "the mere fact that each of these men was a 'manager' within the expansive Spiegel organization is clearly insufficient to establish that matters bearing upon Hill's discharge were within the scope of their employment." *Id.* at 236. Their statements to the employee concerning the plaintiff's discharge were therefore not considered vicarious admissions by Spiegel. *Id.*

In *Trustees of the Bricklayer Pension Trust Fund v. Diponio Construction Co.*, No. 07-15146, 2008 WL 4683427, at *2 (E.D. Mich. Oct. 22, 2008), the Court held that bargaining unit employees are non-managerial employees and do not fall within the scope of Rule 4.2.

### a.  Lavonda Rimmer

Here, the Court concludes that Lavonda Rimmer is not a manager for Rule 4.2 purposes. Bargaining unit employees are not managerial employees and Rimmer is a bargaining unit employee. *Trustees of the Bricklayer Pension Trust Fund*, 2008 WL 4683427, at *4. Additionally, according to Amy Benko's deposition, Rimmer was not Plaintiff's supervisor; Strozier-Wesley was Plaintiff's supervisor. Jackson, Defendant's former Assistant Director of Human Resources, stated under oath that Rimmer was not considered a management employee by Defendant. Rimmer was a member of the nurses' union, not the supervisor's union. Finally, the only supervision Rimmer exercised over Plaintiff was supervising the dispensing of medication. Jackson testified that Rimmer was a "rank-and-file" employee, and "rank-and-file" employees are not managers. *Perry*, 254 F.R.D. at 316.

Furthermore, Plaintiff maintains that the acts or omissions by Rimmer cannot be imputed to Defendant, and her statements could not amount to admissions by Defendant. In her affidavit, Rimmer states that in her opinion, the dispensing job is more physically demanding than the IVAD job, based upon her observations of the pharmacy technicians. Rimmer was not involved in Plaintiff's discharge, nor did she discipline Plaintiff or formally evaluate Plaintiff's performance. Those who merely observed may be interviewed as to those matters without constituting employer admissions; their statements would be important fact information, but would not be employer admissions. *Id.* at 315.

Defendant has merely stated that Rimmer is a managerial employee of HMC, but has not submitted evidence of this. Plaintiff, on the other hand, has established that Rimmer is a "rank-and-file" employee. Furthermore, Defendant has not shown that Rimmer's statements can be

imputed to the Defendant or that her statements count as admissions. As such, communication with Rimmer did not violate Rule 4.2.

### b.  Patricia Ramirez

Defendant argues that while Ramirez did not have managerial responsibility on behalf of Defendant HMC, communications with her are barred under Rule 4.2 because her acts or omissions can bind Defendant and her statements may constitute an admission on behalf of Defendant. Furthermore, Ramirez was the bargaining chairperson for AFCSME Local 1602, and was therefore integrally involved in the events leading up to the termination. Plaintiff maintains that while Ramirez advocated on Plaintiff's behalf, she was not involved in the decision to terminate her. Also, Plaintiff claims that the acts or omissions of Ramirez are not at issue in this case.

Ramirez's statements are about conversations she had with Amy Benko, Marsha Strozier-Wesley, and David Sczcepanski, the people who made the decision to terminate Plaintiff. She merely observed, and so she may be interviewed as to those matters without constituting employer admissions. Her statements are important fact information, but are not employer admissions. *Perry*, 254 F.R.D. at 315.

Rimmer and Ramirez are best understood as rank-and-file employees. Therefore, suppression of the affidavits by a protective order and discipline pursuant to Local Rule 83.22 of Plaintiff's counsel is unwarranted under the circumstances.

### 3.  Discovery After Deadline

Discovery cutoff was set for March 29, 2013. However, Plaintiff served Defendant disclosures containing an affidavit from Lavonda Rimmer on April 1, 2013, and an affidavit from Patricia Ramirez on April 3, 2013.

Defendant maintains that it was prepared to allow the depositions of two additional HMC employees during the discovery period, but Plaintiff determined the additional depositions were unnecessary. Defendant states that Plaintiff should have requested the depositions of Rimmer and Ramirez during the discovery period, or requested that Defendant stipulate to extend discovery and allow for the depositions. Defendant maintains that it was improper for Plaintiff to allow discovery to end and have ex parte communications with employees. Plaintiff unilaterally extended discovery, and has not presented any justification for her choice to not take the testimonies within the discovery period.

The Sixth Circuit has held that the District Court has broad discretion, including imposing sanctions, where a party fails to comply with a scheduling order. *See Estes v. King's Daughters Med. Ctr*., No. 01-5627, 59 Fed. Appx. 749, 753 (6th Cir. 2003). In *Estes*, the Sixth Circuit upheld the striking of an affidavit an expert witness filed after the discovery period had ended.

However, Plaintiff maintains that *Estes* is distinguishable, since in *Estes*, it was undisputed that the plaintiffs did not disclose their expert witness at any time prior to the filing of her affidavit.  In this case, Defendant was aware that both Rimmer and Ramirez were on Plaintiff's Witness List. During Plaintiff's deposition, which was taken a month before the close discovery, Plaintiff testified that Ramirez was a material witness. In Plaintiff's answers to Defendant's Interrogatories, she indicated that Rimmer was a witness and what testimony she would provide. Additionally, Plaintiff claims Defendant has suffered no prejudice. Plaintiff states that Defendant's counsel could have called Plaintiff's counsel upon receiving the affidavits and requested the depositions of the witnesses.

The Court finds that Defendant has not shown it will suffer from "annoyance, embarrassment, oppression, or undue burden or expense" if the affidavits are not stricken. FED. R. CIV. P. 26(c)(1). Therefore, Defendant's Motion for Protective Order is denied.

### 4. Sanctions

The court has discretion to use its "inherent power to levy sanctions in response to abusive litigation practices." *Smith*, 322 F. Supp. 2d at 888 (quoting *Jones v. Thompson*, 996 F.2d 261, 264 (10th Cir. 1993)). Defendant maintains that Plaintiff should be sanctioned for violating MRPC 4.2 and unilaterally extending discovery.

Plaintiff states that she should be awarded attorney fees and costs pursuant to Federal Rule of Civil Procedure 26(c)(3) for having to respond to a frivolous motion for protective order. Under Rule 37(a)(5)(B), a party opposing a motion for protective order presumptively is awarded its expenses, including attorney fees, when the court denies such a motion. The court may not shift expenses and fees if (1) the party filing the motion to compel was substantially justified in seeking the motion; or (2) other circumstances make an award of expenses unjust. FED. R. CIV. P. 37(a)(5)(B). "Substantially justified" means "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 US 552, 565 (1988). A party's decision to seek a motion for protective order is substantially justified if it "raises an issue about whether there is a genuine dispute or if reasonable people can differ as to the appropriateness of the contested action." *Doe v. Lexington-Fayette Urban County Government*, 407 F3d 755, 765 (6th Cir. 2005). Plaintiff maintains that Defendant knew that there was no basis to challenge the affidavits based upon MRPC 4.2, or should have known if it had done a minimal amount of legal research or investigation of the facts and circumstances.

Here, the Court finds no abuse of litigation practices warranting sanctions for either party and denies both parties' requests for sanctions.

## IV.    CONCLUSION

For the reasons stated above, Defendant Hurley Medical Center's Motion for Summary Judgment [#16] is DENIED. Defendant's Motion for Protective Order [#15] is also DENIED.

SO ORDERED.

Dated: June 27, 2013                              /s/Gershwin A Drain
                                                   GERSHWIN A. DRAIN
                                                   UNITED STATES DISTRICT JUDGE